In The 



Court of Appeals
 


Ninth District of Texas at Beaumont


________________



NO. 09-09-00042-CV


 _____________________





IN THE INTEREST OF J.M.









On Appeal from the County Court at Law No. 3


Montgomery County, Texas


Trial Cause No. 08-02-01391 CV






MEMORANDUM OPINION


 L.R. appeals the trial court's final order terminating her parental rights to her minor
child, J.M. She raises six issues on appeal challenging the sufficiency of the evidence. We
conclude the evidence is sufficient to support the trial court's findings. The judgment is
affirmed.

 The Department of Family and Protective Services argues L.R. did not preserve her
issues, because she did not have a statement of points of appeal, as required by section
263.405(i) of the Family Code. See Tex. Fam. Code Ann. § 263.405(b-1), (i) (Vernon
2008). L.R. timely filed a notice of appeal, and included her statement of points in the
notice. Later, L.R. filed another notice of appeal. Referring to this document as the
"amended notice of appeal," the Department argues the notice did not preserve any appellate
issues, because the "amended notice" had no statement of points. We consider the first
notice of appeal to be the operative notice, and the later notice providing additional
information as a supplement. Section 263.405 envisions that appellant file a statement of
points of appeal separately or "combined with a motion for new trial." See Tex. Fam. Code
Ann. § 263.405(b-1), (i). Appellant did neither; she included her points in her notice of
appeal. However, appellant presented the statement of points to the trial court in the hearing
as required by section 263.405(d). See Tex. Fam. Code Ann. § 263.405(d) (Vernon 2008).
The trial court was aware of her points.

 The Department also alleges that the statement of points, even if considered timely
filed, is not specific enough to preserve error on appeal. The Supreme Court held in In re
J.O.A. that section 263.405(i) is unconstitutional as applied when it precludes a parent from
raising a meritorious complaint about the sufficiency of the evidence. In re J.O.A., 283
S.W.3d 336, 339 (Tex. 2009). We are to construe the points "'liberally in order to adjudicate
justly, fairly and equitably the rights of the litigants.'" In re B.L.R.P., 269 S.W.3d 707, 710
(Tex. App.--Amarillo 2008, no pet.) (quoting Williams v. Khalaf, 802 S.W.2d 651, 658
(Tex.1990)). We conclude the points raised are adequate to preserve the sufficiency issues. 
The points refer to specific evidence in the record, which appellant argues, would have made
termination of parental rights insupportable, had the trial court properly considered the
evidence. We construe issues one, three, and four as challenging the sufficiency of the
evidence to support the finding of a ground of termination under section 161.001(1) (D), (E),
and issues two, three, four, five, and six as challenging the sufficiency of the evidence to
support the best interest-of-the-child finding. See Tex. Fam. Code Ann. § 161.001(1)(D),
(E) (Vernon Supp. 2009). 

 Involuntary termination of parental rights implicates fundamental constitutional rights. 
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). Because of the severity and permanency of
the termination of parental rights, the burden of proof at trial is elevated to the clear and
convincing standard. See Tex. Fam. Code Ann. § 161.001. "'Clear and convincing
evidence' means the measure or degree of proof that will produce in the mind of the trier of
fact a firm belief or conviction as to the truth of the allegations sought to be established." 
Tex. Fam. Code Ann. § 101.007 (Vernon 2008); In re J.O.A., 283 S.W.3d at 344. 

 In a legal sufficiency review, the reviewing court considers all of the evidence in the
light most favorable to the termination finding to determine whether a reasonable trier of fact
could have formed a firm belief or conviction about the truth of the matter on which the
Department bears the burden of proof. In re J.L., 163 S.W.3d 79, 84-85 (Tex. 2005). The
reviewing court assumes the fact finder resolved any disputed facts in favor of its finding (if
a reasonable fact finder could do so), and disregards all evidence that a reasonable fact finder
could have disbelieved or found incredible. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). 
The reviewing court does not disregard undisputed evidence which does not support the
finding, because that could skew the analysis of whether there is clear and convincing
evidence. Id. We must consider all of the evidence, not only that which favors the verdict,
in a legal sufficiency review. See City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex. 2005). 
 In a factual sufficiency analysis under the clear and convincing standard, the
reviewing court gives "due consideration" to any evidence the fact finder could reasonably
have found to be clear and convincing. In re J.F.C., 96 S.W.3d at 266 (citing In re C.H., 89
S.W.3d 17, 25 (Tex. 2002)). We consider the disputed evidence and determine whether a
reasonable fact finder could have resolved that evidence in favor of the finding. Id. The
evidence is factually insufficient if the disputed evidence is so significant that a fact finder
could not have reasonably formed a firm belief or conviction. Id. 

 Before parental rights may be involuntarily terminated, the trier of fact must find by
clear and convincing evidence (1) that the parent committed one of the statutory grounds
found in section 161.001(1) of the Family Code, and (2) that termination is in the child's best
interest. See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009). The petitioner has the
burden of establishing both elements, and proof of one element does not relieve the petitioner
of proving the other. See Tex. Dep't of Human Servs. v. Boyd,727 S.W.2d 531, 533 (Tex.
1987); In re B.L.R.P., 269 S.W.3d at 709.

 The trial court terminated L.R.'s parental rights to J.M. on the following grounds:
L.R."knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well-being of the child[,]" and [L.R.]
engaged in conduct or knowingly placed the child with persons who engaged in conduct
which endangers the physical or emotional well-being of the child[.]" See Tex. Fam. Code
Ann. § 161.001(1)(D), (E), (2). 

 Subsections (D) and (E) focus on endangerment, but they "differ with regard to the
source and proof of endangerment." In re A.S., 261 S.W.3d 76, 83 (Tex. App.--Houston
[14th Dist.] 2008, pet. denied). Subsection (D) involves the child's living environment,
rather than the parent's conduct, although the parent's conduct is relevant to the child's
environment. Id. The parent must at least be aware of the potential for danger to the child
in such an environment and must have disregarded that risk. Id. Less-than-ideal living
conditions alone are not sufficient to support a finding under this section. Boyd, 727 S.W.2d
at 533. As to subsection (E), the cause of the endangerment must be the direct result of the
parent's conduct and must be the result of a conscious course of conduct rather than a single
omission or act. In re A.S., 261 S.W.3d at 83; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.--Fort Worth 2003, no pet.). By both actions and failures to act, a parent may exhibit
endangerment. In re A.S., 261 S.W.3d at 83. 

 The Supreme Court has defined "endanger" to mean exposing a child to loss or injury,
or jeopardizing a child's emotional or physical health. See Boyd, 727 S.W.2d at 533; In re
T.J.H., No. 13-06-00407-CV, 2009 WL 2624114, at *17 (Tex. App.--Corpus Christi Aug.
26, 2009, no pet. h.) (mem op.). "Endanger" is more than a threat of metaphysical injury or
the possible ill effects of a less-than-ideal family environment. In re M.C., 917 S.W.2d 268,
269 (Tex. 1996) (citing Boyd, 727 S.W.2d at 533). 

 Under the best-interest prong in section 161.001(2), there is a strong presumption that
the child's best interest is usually served by keeping the child with his or her natural parents. 
Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re of T.J.H., 2009 WL 2624114, at
*19. In determining whether termination is in a child's best interest, the Texas Supreme
Court has set out a non-exhaustive list of several factors: (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3) the emotional and
physical danger to the child now and in the future; (4) the parental abilities of the individuals
seeking custody; (5) the programs available to assist those individuals to promote the best
interest of the child; (6) the plans for the child by these individuals or by the agency seeking
custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the
parent which may indicate the existing parent-child relationship is not proper; and (9) any
excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.
1976). One need not prove that each Holley factor favors termination. In re C.H., 89 S.W.3d
at 27. The list is not exhaustive. In re C.J.F., 134 S.W.3d 343, 354 (Tex. App.--Amarillo
2003, pet. ref'd). The same evidence of acts or omissions used to establish grounds for
termination under section 161.001(1) may be probative in the determination of the best
interest of the child. In re A.A.A., 265 S.W.3d 507, 516 (Tex. App.--Houston [1st Dist.]
2008, pet. denied). 

The Record 


 L.R. is the mother of four-year-old J.M., who has severe diabetes and Wolcott-
Rallison Syndrome, a genetic condition. The trial judge heard testimony from nine
witnesses, including the case worker, the guardian ad litem, a deputy, the child's mother, a
physician, the foster mother, L.R.'s employer, and two family members. The CPS
caseworker, guardian ad litem, and attorney ad litem recommended termination of L.R.'s
parental rights to J.M. 

 The Physician


 Dr. Chen, the child's family doctor, testified J.M. has type 1 diabetes (brittle), and will 
require insulin for the rest of her life. As explained by Dr. Chen, J.M.'s condition requires
close day-to-day monitoring, and her blood sugar should be monitored three or four times a
day. Dr. Chen indicated the caretaker must also monitor the child's food intake and then give
the appropriate insulin dose. He explained that if J.M. is not taken care of "religiously," she
can go into diabetic ketoacidosis and die. When J.M. had an allergic reaction after eating
crawfish in May 2008, she went into ketoacidosis. Dr. Chen explained that this type of
diabetes is unpredictable to a certain point. He also explained that J.M. has had bouts of
pneumonia and previous complications from her diabetes.

The Child's Mother


 One area of concern for the Department was the environment at L.R.'s home. There
is evidence in the record that family members with criminal histories are sometimes at L.R.'s
home and sometimes spend the night there. L.R. testified she has no problem with their
spending the night. L.R. also explained she married a man while he was in prison, and she
did not know why he was in prison. Her plan is to reunite with him when he is released from
prison. There is also evidence in the record that L.R. had been arrested for misdemeanor
possession of marijuana; she pled guilty and was given deferred adjudication. In a
misdemeanor theft case, she pled guilty, was given deferred adjudication, and placed on
community supervision. L.R. also was given deferred adjudication for a felony burglary of
a habitation offense; she testified she completed that probation. Each of the offenses
occurred prior to J.M.'s birth in 2004. 

 Another area of concern for the Department is L.R.'s lack of consistency in meeting
J.M.'s medical needs. J.M. originally came into the Department's care in November 2006,
along with L.R.'s seven-year-old son. L.R. successfully completed the Department's service
plan for her son, and he was returned to her care. The Department determined he was not at
risk in her care. Because of her serious medical condition, the Department believed J.M. to
be at risk. L.R. explained that Wolcott-Rallison Syndrome is associated with diabetes,
"growth stunt," aches, and "cardiovascular malfunctioning." 

 In L.R.'s presentation of her case, she sought to call into question the legitimacy of
the Department's concerns about J.M.'s environment and her ability to meet J.M.'s medical
needs. L.R. testified her brothers who have criminal histories do not live with her, do not
engage in criminal activity in or around her home, and do not keep her children. She further
stated she attended every one of J.M.'s appointments between January and April 2008; she
went to the "diabetic doctor or the genetic doctor[,]" went to the eye appointments, and
properly monitored J.M.'s glucose readings. L.R. explained that she was given instructions
to monitor J.M. three or four times a day -- every time J.M. eats. She stated that she
measured the child's food portions and kept up with her blood sugar levels. She indicated
she was also in agreement with bringing in a health professional to help her care for J.M.

 L.R. presented evidence of employment and assistance from family members: she
works from 9 a.m. to 4 p.m. for a trucking company, and her family members are willing to
help care for J.M. if L.R. has any problems. Her child care plan for J.M. is for J.M. to be in
school.

 L.R. testified she has tried to do everything the Department has asked of her. She
explained that after the May 2008 incident (when J.M. was hospitalized with a severe allergic
reaction after eating crawfish), the Department did not provide her with a new visitation
schedule. L.R. acknowledged that after the May incident, she did not contact the CPS
worker, the CASA worker, or J.M.'s attorney ad litem to assist her in re-establishing
visitation. L.R. testified she called and kept getting the voice mail, but did not leave a
message. L.R. indicated she thought CPS was going to decide the visitation. She
acknowledged she missed the June 23, 2008, court date; she explained she did not know
about that court date, but she also indicated she may have forgotten about it. L.R. also
explained that in November 2008 when S.T. (the foster mother) was in the emergency room
with J.M. for six or seven hours, S.T. told L.R. that she did not need to leave the funeral she
was attending, and that S.T. would contact L.R. if J.M. was going to be hospitalized.

 CPS Caseworker


 Through the testimony of Shirley Nicholas, CPS caseworker, the Department
presented evidence that L.R. was not able to meet the needs of J.M. The caseworker testified
that initially J.M. and her brother came into the Department's care in November 2006
because of the Department's concerns about physical neglect of the children. Nicholas
indicated the home where the children were living was not a clean and safe environment. 
"[T]he main concern was J.M.'s severe diaper rash and the conditions she was in with the
diabetes." Nicholas testified to the following: L.R.'s failure to regularly contact CPS from
November through December 2006 and from June until August 2008; delay in completing
the diabetes class; failure to properly monitor the child's diabetes; delay in beginning
counseling sessions; delay in having genetic testing done on the child's blood; failure to
attend medical appointments after August 2008; and failure to attend the June 23, 2008,
court hearing when L.R. allegedly could have requested visitation. Based on information she
received from the Endocrine Clinic at Texas Children's Hospital, Nicholas indicated the
child's blood sugar needed to be tested eight to ten times a day. The record reveals L.R. did
not test J.M. that frequently. Nicholas testified she did not know if the information from
Texas Children's had been passed on to L.R. Nicholas stated as follows: 

 Attending the appointments gives L.R. more and more knowledge how to care
for this child. She becomes familiar with her patterns, highs and lows, how to
respond to the highs and lows. By not participating, it just doesn't show she
has an interest or the ability to attend the appointments. . . . [L.R.] hasn't
demonstrated that she could go to the hospital, make arrangements and put her
personal needs . . . aside to sacrifice for [J.M.], to be at the hospital, to stay
there the long hours and to put the time she needs to learn how to care for her. 


Nicholas testified regarding L.R.'s failure to come to Texas Children's Hospital in Houston
after J.M. had an allergic reaction to eating crawfish. Although L.R. initially took the child
to a hospital in The Woodlands, the child had to be transferred to Texas Children's. The
record reveals L.R. did not come to Texas Children's during the four days J.M. was a patient
there, even though, as the guardian ad litem testified, J.M. was in "very critical" condition. 
 On cross examination, Shirley Nicholas testified to the following: the child care class
was a retake for L.R., because L.R. had attended the course when J.M. was an infant; during
the April and May period of unsupervised weekend visitation, no one ever informed Nicholas
that the visits needed to be cut off because of any danger to the child's health. L.R. missed
a December 2007 appointment concerning the genetic test results, but attended all of J.M.'s
doctor's appointments between January and April 2008. 

 Nicholas acknowledged that the allergic reaction to the crawfish could not have been
predicted, and L.R. was not at fault regarding the crawfish incident. Nicholas also
acknowledged that L.R. went to the first hospital that J.M. was taken to after the allergic
reaction to the crawfish occurred; L.R. asked what was going to happen with the transition
home and if L.R. would continue to have her visits. Nicholas indicated she told L.R. that she
(Nicholas) did not know. No visitation or transition was reinstituted. In addition, Nicholas
testified that at some point during the May hospitalization she told L.R. that she did not need
to go to the hospital. Nicholas indicated she was concerned about L.R.'s mental state,
because L.R. was crying and very distraught. When L.R. called Nicholas the week after June
1, 2008, and asked about applying for SSI, Nicholas was in court and unable to visit about
that issue. Nicholas said the Department was concerned about L.R.'s lack of contact and her
failure to attend the June 23 court hearing. L.R. had never missed court hearings before, and
L.R.'s attorney did not attend the hearing. In addition, Nicholas indicated the Department
needed to re-establish the clean drug screens before visits could be resumed. However, the
lack of contact limited Nicholas's ability to do that.

 Nicholas testified that in her opinion L.R.'s parental rights should be terminated. 
Nicholas testified she was concerned that J.M.'s medical needs will not be met and that the
child's health will deteriorate if she is left with L.R. In Nicholas's opinion, J.M. could
ultimately die as a result of poor medical care. Nicholas believes termination is in J.M.'s best
interest.

Foster Mother


 S.T., J.M.'s foster mother, testified at trial. Fifty-five years old, S.T. has diabetes that
is under control. J.M. has been in S.T.'s care for approximately two years. S.T. explained
that she has a good relationship with L.R., J.M.'s mother. S.T. testified that L.R. and J.M.
are "very connected." J.M. is also bonded to her brother. S.T. has expressed an interest in
adopting J.M. if J.M.'s parental rights are terminated. 

 In describing L.R.'s efforts to meet J.M.'s needs, S.T. testified that although the trial
judge had instructed S.T. and L.R. to go to all the doctors' visits together, L.R. attended
perhaps forty percent of J.M.'s doctor's visits. During the unsupervised weekend visitations
between L.R. and J.M., which began in April 2008, S.T. became concerned, because
"sometimes when we were doing the weekends, [J.M.'s] glucose levels would be sometimes
really off." Sometimes the readings would be really high or low when J.M. was returned to
S.T.'s care after a weekend visit. S.T. testified that L.R. was not correctly monitoring J.M. 
 In November 2008, S.T. took J.M. to the emergency room because she was congested. 
S.T. called L.R. to inform her of the emergency room visit, but did not tell L.R. it was a
crisis. L.R. was at her aunt's funeral and did not come to the emergency room. S.T. and the
child were at the emergency room approximately six or seven hours. S.T. indicated she
would consider L.R.'s having some type of access to J.M., but S.T. would not be comfortable
leaving J.M. with L.R. for an unsupervised visit. 

Guardian Ad Litem


 Connie Spire, the guardian ad litem for J.M., has been involved with J.M.'s case since
November 2006. Spire has attended some of J.M.'s doctor's visits with S.T. and has been
at the hospital with J.M. Spire's recommendation is to terminate the parental rights of L.R.
to J.M. Like Nicholas, Spire is concerned about L.R.'s failure to come to Texas Children's
Hospital when J.M. was a patient there for four days. J.M. was in "very critical" condition. 
L.R. did not come, nor did she call. Spire testified it is important for L.R. to demonstrate that
she is concerned about her child and to show up every time her child has a medical crisis. 
During the two month period up to August 2008, Spire indicated L.R. did not contact Spire. 
Spire testified she "called [L.R.] every time [there was] a court date to remind her that we
have a court date, the day before, every time." Like S.T., Spire was concerned that L.R. was
not properly monitoring J.M.'s glucose. Spire indicated that on some days, readings showed
only two or three sporadic meter readings. Spire testified she believes S.T., the foster
mother, has demonstrated she has the ability to meet J.M.'s special needs, and that a plan
with S.T. as caretaker is in J.M.'s best interest.

 Admitted into evidence was a list of glucose meter readings written down by Spire and
S.T. from L.R.'s meter. The exhibit reflects that on two out of sixteen days, L.R. monitored
the child only once each day. Four of the sixteen days, she monitored the child twice each
day. Ten of the sixteen days, L.R. monitored the child at least three times each day. Spire
acknowledged that on some of the days L.R. did not have J.M. the entire day, and on a short
day, there understandably would be only one or two measurements. Spire also acknowledged
that Dr. Chen's testimony regarding how many times a day to monitor is different from the
information from Texas Children's Hospital. Spire testified she received the eight-times-a-day monitoring information in a written paper from Texas Children's, but she does not know
if the information was given to L.R.

Mother's Employer


 Testifying on behalf of L.R. was Victoria White, L.R.'s employer. White explained
that L.R. had been working at the trucking company approximately six months. White
testified L.R. gives proper care to J.M. and has observed L.R. monitoring J.M.'s food, giving
her insulin, and recording the information. White also indicated L.R. has helped White with
her own diabetic daughter by giving an overview of diabetes and guiding White through the
giving of insulin injections.

 L.R.'s Family Members



 Two of L.R.'s family members testified the family would assist L.R. when needed.
One of the family members explained that she took the special diabetes class when she
learned J.M. was diabetic.

Application of Law to Facts


 The trial court concluded that L.R.'s parental rights to J.M. should be terminated. The
disputed part of the case is whether L.R. is capable of meeting the special needs of this child.
L.R. argues the disputed evidence is so significant that a fact-finder could not reasonably
have formed a belief or conviction that termination was justified, and therefore the evidence
is factually insufficient to support termination. L.R. points to evidence of bonding between
J.M. and L.R., a stable home, and adherence to the service plan. She also argues that any
evidence of failing to provide for J.M.'s physical or emotional needs is scant and that the
evidence is legally insufficient.

 Under subsections (D) and (E) of section 161.001, the relevant inquiries are whether
there is evidence the parent knowingly placed or allowed her child to remain in conditions
or surroundings that endangered her physical or emotional well-being or whether evidence
exists that the endangerment of the child's physical and emotional well-being was the result
of the parent's conduct, including acts and omissions. See Castaneda v. Tex. Dep't of
Protective & Regulatory Servs., 148 S.W.3d 509, 522 (Tex. App. -- El Paso 2004, pet.
denied). The undisputed evidence is that J.M. has a genetic condition and an acute case of
diabetes that requires frequent, daily monitoring. Her diabetes has the potential to go into 
ketoacidosis, and when it does, as was the case with the May 2008 hospitalization, the
problem can be life-threatening. The trial judge viewed this evidence, along with evidence
that L.R. did not come to Texas Children's Hospital when J.M. was in critical condition; did
not monitor J.M.'s glucose as frequently as she should have; did not appear at an important
medical appointment; did not attend some of the other medical appointments; did not come
to the hospital in November 2008 when the child was brought to the emergency room; did
not pursue visitation when the weekend visitations ended after the May 2008 incident; did
not attend the June 23, 2008, court hearing; and did not appreciate the difficulty of taking
care of a special-needs child like J.M. 

 Endangerment includes jeopardizing a child's physical health. Boyd, 722 S.W.2d at
533. The endangerment may involve the parent's actions or failure to act. In re H.S., 261
S.W.3d at 83. The record, as detailed herein, reveals J.M.'s physical heath was jeopardized. 
Applying the applicable standards of review, we hold that the evidence was legally and
factually sufficient for a factfinder to reasonably form a firm conviction or belief that the
parent violated section 161.001(1)(D), (E) by knowingly placing or knowingly allowing the
child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child and engaging in conduct which endangered the physical or emotional well-being of the child. 

 We consider the best-interest prong. L.R. argues, in effect, that evidence regarding
endangerment to the child should be considered only during the period prior to the child's
removal, and that the trial court failed to consider her "recent turnaround" and compliance
with the service plan. She recites the following evidence in the record relating to her efforts
to comply with the Department's service plan after J.M.'s removal: attendance at J.M.'s
doctor's appointments, the Department's return of L.R.'s other child to her, L.R.'s successful
weekend visits with J.M., and L.R.'s efforts to try to obtain SSI. Also before the fact finder
was evidence concerning a young child with a serious case of diabetes and an associated
genetic syndrome. As Dr. Chen explained, taking care of a child with "brittle" diabetes
requires "religiously" monitoring the child's glucose levels, monitoring her food intake, and
administering the proper insulin dose. The doctor's opinion was that J.M., because of her
medical condition, could die as a result of the failure to properly take care of her physical
needs. Also before the fact finder was evidence showing L.R.'s initial lack of interest in the
diabetes and counseling classes, a lack of consistency in monitoring J.M.'s glucose levels,
a pattern of failing to consistently attend J.M.'s doctor's appointments and to be present at
her hospitalization, and a failure to consistently keep in contact with the Department.

 L.R. argues that the trial court, in determining the best interest of the child, failed to
consider that L.R.'s home environment is stable and that it is in J.M.'s best interest to remain
in L.R.'s home with J.M.'s sibling. The record gives no indication that the trial court failed
to consider evidence regarding J.M.'s sibling and the home environment, including the
presence at times of those with criminal histories for overnight stays. These were among
several factors before the trial court in making a best interest determination. 

 There is no doubt that J.M. has a serious medical condition that requires intensive
monitoring and treatment. J.M. has been in the custody of S.T., the foster mother, for two
years. In addition to the evidence detailed above regarding L.R. and J.M., there is evidence
that S.T., the foster mother who is interested in adopting J.M., attended the child's medical
appointments, stayed with her in the hospital, and cared for her at home. S.T. is familiar with
the diabetic condition. The record reveals S.T. has a stable home environment in contrast to
that of L.R. Given the record in this case, and applying the applicable standards of review,
we hold that the evidence was legally and factually sufficient for a reasonable factfinder to
form a "firm belief or conviction" that it was in J.M.'s best interest for L.R.'s parental rights
to be terminated. We overrule L.R.'s issues and affirm the judgment of the trial court.

 AFFIRMED.

 ____________________________

 DAVID GAULTNEY

 Justice

Submitted on November 30, 2009

Opinion Delivered December 31, 2009


Before McKeithen, C.J., Gaultney and Horton, JJ.